2014-12-19. Mr. Smith. Thank you, Your Honor. Robert Smith, the appellant, M.Z. Berger, and may it please the Court. Under the Trademark Law Revision Act, an applicant can apply for a trademark based solely on a bona fide intent to use the mark at a later date. The applicant's intent is then ascertained at various stages throughout the process through increasing requirements of proof. Here, the Board got the timing wrong. It is only later in the process, after an opposition proceeding, that an applicant is required to verify actual use or the steps that it has taken to develop, market, and ultimately use the product in commerce. So, are you saying that they can't even look behind your filing to see whether you had an intent to use at the time you filed the ITU? No, I'm not saying that. They can't? They can't. The D.C. Circuit said also that they can't. Well, the D.C. Circuit was presented with a slightly different question. I know, but they said it. Sure. They said it's an objective inquiry. Sure. And you have to make a showing, right? Circumstances showing good faith. I believe that's the very words of the statute. So, you know, I think you have to probably do a little bit more than just raise your hand and say, I did have an intent. That's correct. That is correct. But those are not the facts here. And just to talk about the standard briefly, what the legislative history says, what I think the text structure and purpose of the statute say is that the Senate report at page 24 says that a verified statement is often enough. And then you have to essentially cast doubt on that. And the sorts of situations that the board has traditionally looked at to cast doubt on that are sort of extreme circumstances. No objective intent whatsoever. No testimony. No documents. Very numerous cases where the board did that. In L'Oreal, in Research in Motion, in Honda Motor, in Boston Red Sox, all those cases had no evidence whatsoever. In the other cases, the evidence that we submitted was more than sufficient under board precedent. Wet Seal involved a case where there was no evidence of a business plan or intent to use the mark for every product. And the application was far broader than the application at issue here. Well, maybe the TTAB, what they had here that was different from some of these other cases is that they had some conflicting evidence in front of them that made things a little more unclear. And so, assuming for the moment that the evidence was in fact conflicting and that people were talking like this, then maybe it's not so unreasonable for the TTAB to find it doubtful that there in fact was some kind of plan in place at the time the ITU was filed. Sure. I mean, respectfully... And so then the case really boils down to, all right, how conflicting was the evidence if it wasn't conflicting? Sure. And just to say, though, the TTAB has had cases before where there was conflicting and ambiguous evidence and they put the burden on the opponent. They said the ambiguity is on the opponent because the opponent bears the burden of proof. So, again, in Wet Seal there was ambiguous evidence in that case and the board said that's not enough. Here we have a capacity and there's a difference between having no intention and not yet having plans. And there's no way to square that case with what happened here. And if you look at the evidence, we don't need to take on the board's factual findings because here... I'm sorry, you said something I got a little lost. Sure. There's a difference between no intent and not having plans. Yes, not yet having plans. So it seems like both those categories would fall in the same place, no intent to use. No, I disagree. There's a difference between... I can have a bona fide intent, right? I mean, it's an objective standard. There has to be some circumstances, I agree with you. But I can have a bona fide intent to not have business plans yet. Well, then what... Okay, this is getting interesting. What is your understanding of what's a bona fide intent? A bona fide intent is... A state of mind? It's a state of mind... That's it? And then it's verified through objective real life factors. So here let's talk about the objective real life factors. Well, wouldn't plans be objective real life factors? Sure, they are. And then if you don't have the plans, then what else could be real life objective factors? Sure. So real life objective factors could be, first and foremost, the fact that my client produces millions of watches annually. The fact that my client has been in this business for 60 years... But it doesn't call them eyewatches. No, it doesn't call all of its watches eyewatches, but eyewatches is a brand name. That has no relation to the issue of intent to use the watch. But I think rightly so, capacity matters, right? In the cases where the board has found no evidence of intent, it's generally dealt with situations where there's no capacity whatsoever. Does the word nexus have any utility here? Nexus between capacity and intent? Yes, and I think we have it. We have repeated meetings. These are objective facts that witnesses testify to where they discuss a logo, where they discuss potential features, where they discuss potential accounts and vendors, where they discuss a lowercase i and a capital... In connection with the mark. That's right, but in connection with developing a product for that mark. We're not talking about a name here. We're talking about features that are going to go into this, potential colors. They did renderings, obviously, that were submitted to the Patent and Trademark Office, but beyond that they produced a logo that was never submitted to the Patent and Trademark Office. That's at JA 761 and 763. There's a lot of evidence here. I'll also point out, just as a factual quirk, normally the board has said that you're not under an obligation to do any kind of renderings or promotional material. There are cases where they've allowed an applicant to wait a year or more before they do that. Here, because of descriptiveness concerns, just three months after my client applied for the mark, the PTO said, we'd like to see some samples of advertising because we have descriptiveness concerns. Our client obliged us and then... And generated some drawings so that they could supply them to the trademark examiner. Sure, that's right, but that doesn't mean that they have no other purpose going forward. It's a bit unfair to say that three months out of the gate, even though we've never insisted on this kind of evidence before, now we're going to hold that against you. You really didn't have a bona fide intent simply because you produced these to the Patent and Trademark Office. Well, I mean, but it was understandable why the examining attorney wanted some kind of sample, right? Because it looked like it was a potentially descriptiveness situation. Absolutely, and I get that and that makes complete sense. But then to hold that against my client later on and say, well, you didn't have evidence of promotional material using this for other purposes, so sorry, we're going to disregard that. Maybe it was a more holistic endeavor, though. They said, did you have, in fact, some kind of built-up mock-up of a watch with the mark on it? And no, that wasn't the case. And then you had a 30B6 witness, I guess it was Mermelstein, who was saying that if Berger were to ever come out with a technology watch, then it would be really nice to have the mark iWatch. And obviously, that doesn't sound very good when it comes to doing the ITU, and then you've got the trademark search being done one hour before you file the ITU application. Typically, trademark searches are useful, but right at the hour before you file the ITU, it obviously weakens the context of the trademark search. And then you had some other conflicting testimony about whether these renderings were, in fact, ever put in front of a buyer. Sure, but the key facts, and if I can briefly address the Mermelstein testimony, that if was in relation to when he came up with the idea for the mark. That's clear in the record. It's a JAA45. And we had other witnesses testify that after that, they had a meeting where they determined that this was something that they were going to pursue, and they made a firm intent at that point. And let's talk about the standard a bit here, and this court's decision in Eastman Kodak. Was there ever any actual R&D on making a technology watch? No, they certainly explored and discussed that, but there wasn't any research and development on the record. Typically, to make a technology watch, it would take years. And as we all know, the trademark office happens to be pretty fast when it goes from ITU filing date to possible allowance date. It doesn't take that long. And that's how the process should work. Right, but I guess the point is, I mean, this isn't in the record, but contextually speaking, you know, if you're going to try to go for a technology watch with a mark on it, and you file your ITU, and you hadn't taken step one into how you would build that technology watch, I mean, doesn't that sound a little funny to you? Not at all, Your Honor. I mean, here, the system that was set up, and again, to talk about this court's decision in Eastman Kodak, because it's the closest thing to discussing the scheme that's in place, Congress wanted to lower the initial barriers, especially for family home businesses like this. All you need is a bona fide intent and a verified statement, and then there are escalating standards of proof. There's no requirement that you generate a mock-up product. There's testimony in the record that this would be $15,000, $10,000, $15,000. Congress said that's absolutely not required. And in this court's decision in Eastman Kodak, it recognized that some issues of registrability simply can't be decided in an opposition proceeding. There's just not enough evidence. It's for a quick look. We can look at this, and in this situation, it's clearly descriptive, this is Eastman Kodak. So, it's done. But otherwise, in that case, the board deferred decision until the administrative review process, and until thereafter, if necessary, in cancellation proceedings. And there was an argument similar to what my opponent says in that case, which was, well, there's some concerns here about tying up marks. And this court said, no. Congress struck a different balance in the statute. It wanted to make it easy to do an initial application and then trust the statute to weed out those applicants that can't meet the varying levels of proof. And I think here, this is such a departure from what the board has been doing in the past. Again, if you look at cases like L'Oreal, like Honda Motor Corp., like Boston Red Sox, there's no evidence whatsoever, testimonial or documentary, to demonstrate proof. And this is an exact take back to requiring token use. The requirement of documentary evidence, a business plan, all that's going to do is give sophisticated applicants an opportunity to generate a plan, even if they don't have a bona fide intent. It's going to tell you nothing. What if we read the TTAB decision as not necessarily requiring an actual product or some very advanced plan, but what they were facing was an inconsistent story, an inconsistent narrative from a few different witnesses, and so they were left confused? If that's the way I read the TTAB decision, then where is the error in that? We still win under that construction because what the TTAB found wrong in the record was with minor details. It really was about minor details. The broad evidence about my client's capacity, about the meetings, about the discussions about logo, about features, none of that was contested in this record. The fact that they generated logos that weren't submitted, all of that is uncontested on this finding, and I'd like to reserve some time for rebuttal. We'll give you your three minutes back, Mr. Smith. Thank you. Mr. Lindenbaum. Good morning. May it please the Court. The Board considered all of the testimony and it found that at the time the application was filed, the appellant did not make a firm decision to use the mark, but instead filed its application to reserve a right and a mark. What does it take, a decision of the President or the CEO, if I determine that we're going to use this mark on this product? It's a determination by the company which can be corroborated and supported by the totality of the circumstances, that a decision is made that we're not just, this is a good mark that we like, let's run to the trademark office and file an application so we can get first in line, and then let's figure everything out later. Mr. Smith says they were in the business, they'd made lots of watches. Right, but the statute, of course, doesn't allow... Are you saying that there must be a nexus between the mark and a particular product showing an intent to use that mark on that product? Yes. Otherwise, then any company would have an automatic right to reserve whatever marks it wanted, so long as it was just in the business that the company was in. The statute clearly says there must be a bona fide intent for each of the goods being applied for that mark. Haven't there been a couple of TTAB decisions where, just relying on the testimony of the witness, there was a bona fide intent? There's never been a case with these facts. We started... No, no, I'm not talking about your facts. I'm talking about the facts that I just described. Right, but in those cases, the witnesses never admitted that they didn't intend for most of the goods that found their way into the application to be there. For the category of clocks in this case, the witness says, we never intended to use the mark for clocks. In those cases, you don't have that immediate conflict in testimony. There could be circumstances where witnesses come in with compelling enough testimony which establishes that they, in fact, made that firm decision. Here, when you have the company admitting that most of the goods in the application we never intended to include, a paralegal included those because she mistakenly believed that was the standard list that we should include. When the company during the Rule 30b-6 deposition is asked, do you intend to use the mark for clocks and says no, and at the time of the application, did you intend? No, there's never been those cases. Also, we have the addition here of no corroborating documentary evidence. Under the board's precedence, when there's no documents to corroborate the otherwise subjective state of mind that the appellant says, the burden shifts to the appellant and they must now come forth with compelling evidence to overcome that shortcoming. What about the other side? They're saying there were conversations with buyers, there were meetings, there were e-mails, there were logos generated. Right. The board considered all of that. All of those sorts of things ought to be considered relevant, even compelling evidence to just establish an intent to use, right? The board did consider. That's why there's no error here. The board did consider all of that evidence and not only considered it, but it explained in detail in its decision why all of that evidence was unreliable, why it was inconsistent, why it was vague. The meeting with the buyer, we asked in an interrogatory, explain the circumstances of this buyer and the response which is quoted in the board's opinion is, our employees meet with buyers all the time. We can't remember who that buyer was, when it occurred, or even what was discussed during the meeting. Then we questioned the witness, the company, in the Rule 30b-6 deposition, tell us about this meeting with the buyer. He was asked, did you ever pitch the product to a buyer? He said no. Then he was asked, was the iWatch mark ever discussed with anyone outside of the company? He said no, except for his attorneys in the opposition. Then there was some woman, I can't remember her name, who then came forward and said she talked about it with the buyer. She talked about the meeting with the buyer, and then the board considered her testimony, weighed it against the inconsistent interrogatory response and the deposition testimony, and also considered whether her testimony itself was reliable. She too said she couldn't remember who even the buyer was, when the meeting occurred, a lot of the details of the meeting. The board did consider that, it made its ruling, and its findings are supported by substantial evidence in this case. They talk about the other evidence that they came forth with these meetings. We came, we had meetings, we discussed certain things, but the board again considered all that evidence and considered the testimony of the company, Mr. Mermelstein, at his Rule 30b-6 deposition, and he said no, we didn't make any of the types of decisions that anyone who made a firm decision to use a mark would have made. It's shown to be true. After the application was filed and before the opposition was filed, there was a 15-month period, and even during that time, nothing happened. There's been no events or anything to then corroborate that, in fact, at the time the application was filed, that there was a bona fide intent. And these meetings that they talk about, perhaps the most important point there is we questioned every one of the witnesses who said that they had knowledge about these meetings, and none of them could confirm the date that any of these meetings happened, and that's important because if they can't confirm the date, it wasn't even just the day or even the month, they couldn't confirm a year that any of these meetings happened. And if they couldn't do that, then how can the Board rely on that as evidence that's contemporaneous with the filing of the application, which is ultimately the question that the Board had to answer. What do you think is the right verbal formulation for what is the legal standard for establishing a bona fide intent to use? I think the Board got it right in looking at there's a requirement that there must be And I think it's even fair that the language the Board chose, which is you need evidence that a firm decision was made to use the mark, and this wasn't just evidence that you were filing an application to reserve that. But when you say objective evidence, do you mean objective documentary evidence? What do you mean by objective? I think it has to be, it can be objective, obviously documentary evidence is the best form of documentary. Yes, of course, but is it required? I think under certain circumstances you can also have objective testimony as well. Particularly what would be more probative that we didn't have in this case was testimony from anyone outside of the company. A buyer, an engineer, someone who they had spoken to who could then corroborate that yes, in fact, this company had a bona fide intent. But even that's missing here. The reality is, and it's captured in the testimony of one of the witnesses who notes quite candidly that they saw that iPods and iPads were out there and very successful, and they thought there was value in that. Not iPads. iPods were out there. iPads didn't come out in 2010. Right. It was iPads and other iProducts. Maybe it was iHome, I think that they referenced. And they thought there was value to that, and they wanted to stake their claim in that field. The other point I want to address, which is this notion that the opposition proceeding is too soon to actually require that they be put to task on these issues. There's no support for that. Congress didn't create two different standards for bona fide intent. The same bona fide intent that you have to have when you file your second request to extend your time to file your statement of use is the same bona fide intent you have to have when you file your application. But when you file your application, all you have to do is submit a declaration, right? You don't have to submit, you have to do a showing. That's right, but the standard is the same. But now when you get to the TTAB in an opposition proceeding, now you have to make a showing. That's right, and I think that's common throughout the patent and trademark office practice, similar in a patent case. When you file your trademark application, the trademark office takes your sworn declaration for what it says. But if you're involved in an opposition proceeding, it's then the day of reckoning. You then have to come forth and defend that claim. And the Kodak case, which says that there are sometimes certain issues that can be decided in the second examination after the statement of use is issued, that's only for issues that could not be fully considered during the initial examination. But whether a party actually has a bona fide intent at the time it files its application is obviously an issue that can be decided right away because it's based on the events of the initial application. So if I can turn to the issue of likelihood of confusion. Here the board got it mostly correct, but it made one particular issue in its findings. It recognized that the swatch mark is a distinctive mark. The swatch falls into the highest category of protection. It's an arbitrary or fanciful mark. If we were to affirm on the intent question, do we have to reach the likelihood of confusion question? That's an interesting question. I think if you affirm that the mark was, there was no bona fide intent, then the finding is really that the application was void ad initio, that at the beginning it was void. And so the court, I believe, can affirm on lack of bona fide intent and vacate the TTAB's request. How can there be confusion with an application that was void ad initio? So yes, I think that the court can do that. I think it would be prejudicial to swatch if the board affirms on lack of bona fide intent and just doesn't decide the issue of likelihood of confusion because I believe if it's not vacated, the decision should be reversed. But I believe that, yes. But it's canceled, right? If we affirm on lack of bona fide intent. So what prejudice is there to you on the other issue? Well, if the other issue is not vacated, then there's still a precedential finding by the board that there's no confusion between these two marks, which we haven't had. But the mark doesn't exist anymore. The application doesn't, but I don't know that, I think the board's ruling on likelihood of confusion, though, could still be argued to be precedential still. How? You mean if somebody else comes in and tries to register this mark that it would be somehow found to be a likelihood of confusion against your company? That would be the concern. How would that be possible? It would be presumably by another company or a new application by this company. Right. But you have the precedential findings of this, of the board as it exists now, which is that those two marks are by themselves confusingly similar. So the board found that the swatch mark is famous. And under this court's rulings in the Kenner and Rico case, that means that that factor always has to play a dominant role. But then it also found that the overall commercial impression of the two marks is dissimilar. Right. And the error made in reaching that conclusion… I mean, because if we decided against you, then you're not only going to have a precedential TTAB decision against you, you're going to have a precedential Federal Circuit decision against you. Yes. Obviously, that would be a worse scenario. Vacating the TTAB decision would be beneficial for us. But if the court is not inclined to do so, we think that then the issue should be reversed. So turning to the error that the court made, and it found the two marks similar, but it did so only after it discounted the watch portion of the swatch mark. And by finding the mark famous, it's a finding that consumers will immediately recognize the mark swatch. It will recognize it as the brand swatch. And so there's no evidence in this record that consumers who encounter the word swatch is going to recognize it as S and watch. And if you consider the mark in the entirety and compare it to iWatch, and given all the other factors that favor Opposer in this case, the appellee, which was that the mark was famous, that the goods were identical, the channels of trade were identical, considered to be purchased on impulse by non-sophisticated buyers, all those factors being found in favor of Opposer lessens the degree of similarity that's needed to find likelihood of confusion between marks. And if you consider the mark in the entirety, instead of discounting the watch portion, which the board did, then a finding of likelihood of confusion should be made. And on that basis, if the board chooses not to vacate, the board's decision should be reversed. I don't have anything further unless the court does. Thank you, Mr. Lindenbaum. Thank you. Mr. Smith has a little rebuttal time. I think we've given you three minutes. I believe so, Your Honor. Thank you. I'm hoping to make quick two points. I want to start with the legal standard really quick to make sure that I'm clear on that. I think at an opposition proceeding, you only need some objective evidence of bona fide intent. That should be the standard. As far as my opponent here said that nothing happened in the 15 months, that's just not true from the record. There is a nexus to this particular product line. We know that they had discussions about the mark. We know they discussed the logo, potential features, potential accounts and vendors, the lowercase i, the capital W, a trademark search, renderings, produced a logo. All of that evidence is in the record and those big picture items are simply not in dispute. The inconsistencies that they cited, they really are minor inconsistencies in this record. Mr. Mermelstein testified at the beginning that he had some knowledge but not all knowledge. It was clear from large portions of the testimony that they were referring to him in the first person as you and it was only clarified at JA 60 in the record that when they were using that pronoun, what they meant to say was he was testifying on behalf of the company. Look, we have evidence from two other witnesses that verified that the mark was discussed with a buyer. We have testimony from Ms. Russo and there are a lot of details here. Granted, this woman meets with hundreds of potential buyers and discusses thousands of that she discussed the mark with at least one buyer. The meeting occurred in MZ Berger's Manhattan showroom. It occurred in late 2007 or early 2008 during market week. The prospective buyer was a woman. They discussed features for the mark and they discussed potential price points. And then that is all confirmed in a subsequent email that Ms. Teterra sent to the CEO relaying what happened with the discussion and the status of the trademark. You couldn't recall the year, right? She was vague on the year, but you can tell from the record that it was in late 2007 or early 2008. And I think you can pull that out from JA 1779, 1252, and 1254. And I think all of that, given the low standard that should be applied here in order to satisfy the congressional intent of this statute to lower burdens on less sophisticated applicants, like my client, the standard just needs to be some objective evidence. And that is fully consistent with what the board has been doing for the last 25 years that this statute has been in play. And it is only in this decision that they are suddenly imposing an increased burden on my client. And if I can just briefly address likelihood of confusion, I think... I think there is just a fundamental difference between the two-syllable word I watch and the one-syllable word swatch. And if you consider the fact that generic terms are given virtually no weight in a likelihood of confusion analysis, once you take out that watch, you know, swatch doesn't get to have a monopoly on any word that includes the word swatch in it. And for those reasons, we would ask you to reverse on the decision on bona fide intent, affirm or just not deal with likelihood of confusion and remand for a noticeable lapse. Thank you. Thank you, Mr. Smith. We'll take the case under revising. Thank you, Judge. Thank you. All rise. The Honorable Court is adjourned from day today.